**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION**

J & B ENTERTAINMENT, D/B/A
BABE'S SHOW CLUB                                                    PLAINTIFF

vs.                                                    Civil Action No. 3:06-cv-144WS

CITY OF JACKSON, MISSISSIPPI;
MAYOR FRANK MELTON, IN BOTH HIS
OFFICIAL AND INDIVIDUAL CAPACITIES;
SGT. WILLIAM GLADNEY, IN BOTH HIS
OFFICIAL AND INDIVIDUAL CAPACITIES;
DETECTIVE SAMUEL GARDNER, IN BOTH
HIS OFFICIAL AND INDIVIDUAL CAPACITIES;
AND JACKSON POLICE OFFICERS, JOHN
DOES ONE THROUGH TEN, IN BOTH THEIR
OFFICIAL AND INDIVIDUAL CAPACITIES                                  DEFENDANTS


**<u>MEMORANDUM OPINION AND ORDER</u>**

Before the court is the presentation of the plaintiff J&B Entertainment, d/b/a

Babe's Show Club (hereinafter the plaintiff or "Babe's") for damages against the City

of Jackson, Mississippi, resulting from the conduct of former Mayor Frank Melton, Sgt.

William Gladney and Detective Samuel Gardner which led to the improper closure of

Babe's for a period of twenty-four days. Babe's request is for lost profits and

consequential damages. Previously, on April 7, 2006, Babe's persuaded this court

that defendants' closure of the establishment on March 11, 2006, supposedly under

the auspices of Art. VII, Licensing and Regulation of Sexually Oriented Businesses,[1]

---

[1]In another lawsuit, *A&C Entertainment, et al. v. City of Jackson*, Civil Action No. 3:01-cv-88 WS, Babe's has challenged the constitutionality of this Ordinance, but, significantly, in this lawsuit, Babe's is proceeding under the Ordinance as though it is constitutional, without waiving any of its constitutional challenges. Thus, this court has analyzed Babe's request for injunctive relief under a presumptively-valid municipal Ordinance, even though in another

Ord. No. 2000-26(25), codified in Jackson, Mississippi, Code §§ 30-251 to 373, violated Babe's procedural and substantive due process rights guaranteed by the Constitution of the United States.  Finding that the law and facts supported Babe's claims, this court declared the defendants' closure of the establishment improper, allowed Babe's immediately to reopen for business, directed Babes to submit a proper six-page application for a sexually-oriented business license by April 14, 2006, and permitted the case to proceed on the merits of the constitutional claims.  The defendants, the City of Jackson, Mississippi, Mayor Frank Melton, Sgt. William Gladney, Detective Samuel Gardner, and the Jackson Police Officers John Does One Through Ten, did not pursue an appeal of this court's grant of the plaintiff's request for injunctive relief.  Now, the defendants concede the matter of liability to the plaintiff.

On March 24 and 25, 2009, this court conducted a bench trial solely on the issue of damages allegedly suffered by Babe's as a result of the defendants having closed the establishment for twenty-four (24) days, and for consequential damages allegedly suffered for the four month period following the reopening of Babe's.  The parties presented widely divergent methods regarding the reasonable calculation of damages, the plaintiff claiming the amount $126,705.31 for the twenty-four days Babe's was closed, plus the cost of reestablishing the business over the following four month period after Babes' reopened.  The defendants, following a completely different methodology, submitted that the amount of damages should not exceed $8,586.10.

---

lawsuit this court will address Babe's constitutional challenges.

## FACTUAL BACKGROUND

This court, after conducting a hearing on the merits of granting injunctive relief, entered an opinion fully setting forth the facts leading to the closing of Babe's by the City of Jackson, and its failure to follow the terms of its Ordinance, a failure which led to the initiation of this lawsuit under Title 42 U.S.C. § 1983[2].   In summary, this court found that the plaintiff operated as Babe's Show Club, presenting First Amendment protected performances by exotic dancers described as sexually-oriented.  These performances were directed at adult entertainment.  This court also found that Babe's was established in Jackson, Mississippi, based on significant investment.  Babe's obtained all the building, site plan, and certificates of occupancy required by law.  In 2003, Babe's applied for and obtained the necessary license for a general operating business privilege, and the license for the operation of a sexually-oriented business. The parties agree that Babe's obtained the necessary licenses for operation of a sexually-oriented business in March of 2003, and that this license expired in March of 2004.  Thereafter, according to the witnesses for Babe's, obtaining a permanent license for a sexually-oriented business became more difficult.  Instead of issuing the

---

[2]Title 42 U.S.C. § 1983 provides that, "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia."

ordinary sexually-oriented business licenses for one year, the City of Jackson began to issue Babe's temporary licenses.

Bo Powell, the General Manager of Babe's, testified that he became concerned about the new policy of issuing temporary licenses and personally attempted to renew Babe's license for the sexually-oriented business on January 13, 2005. Powell stated that he completed an application and was informed by a City of Jackson employee that the "Temporary License" he was issued would allow Babe's to continue its business operations until a permanent license was issued. Thereafter, Powell says that he repeatedly contacted the License and Permit Unit to inquire about the permanent license, and was always told that the January 13, 2005, temporary license would suffice until the permanent license was issued.

In October of 2005, Bo Powell says he directed Richard Merritt, a Manager at Babe's, to go to the License and Permit Unit for the City of Jackson on the sixth floor of the Standard Life Building. Merritt stated that he was directed by a police officer on duty there to proceed to the Sign and Permit Office located on President Street in Jackson. Merritt sais he paid the clerk on duty at the Sign and Permit Office $200.00 and came back to Babe's with the January 13, 2005, application stamped "Paid October 28, 2005." Powell and Merritt said they believed that the Babe's "Temporary License" had been reissued in accordance with what appeared to be the current custom and practice. Powell noted that he did not feel assured by the way the purported reissuance was handled. His doubts were answered on January 29, 2006.

On that date former Mayor Frank Melton and several Jackson Police Department Officers entered Babe's and informed Richard Merritt that the

4

establishment would be closed by the City of Jackson as early as Friday, February 3, 2006, because it was operating without a valid license. On March 10, 2006, City of Jackson police officers delivered a letter to Babe's from Detective Samuel Gardner, Inspector, License and Permit Unit, City of Jackson, stating that:

> [y]our business does not have valid Sexually Oriented Business License. According to our records you applied for renewal of your business license on January 13, 2005, but no record of a license being issued. However, there is no record of an application or license issued for 2006.

On March 11, 2006, says plaintiff, after opening Babe's for business as usual, City of Jackson police officers appeared and closed the business indefinitely. The manager, Richard Merritt said that, when he protested the closing, he was arrested by Sgt. William Gladney. Merritt says that he remained in police custody until 2:00 A.M. the following morning.

So, on March 13, 2006, the plaintiff filed this lawsuit claiming several violations of its constitutional rights as the result of being closed without proper justification. The plaintiff asked for injunctive relief, damages, attorney fees. On March 27, 2006, this court conducted an evidentiary hearing on plaintiff's motion for injunctive relief and heard from various witnesses. The witnesses for Babe's complained of the haphazard, and frustrating way in which licenses for sexually-oriented businesses had been handled by the City of Jackson. Bo Powell stated that he seldom got a straight answer on any question from any City of Jackson representative, and that he felt each employee he contacted was simply trying to "pass the buck" when dealing with adult entertainment issues. Both Powell and Richard Merritt told of their unsuccessful efforts to obtain a proper license for the operation of a sexually oriented business and

5

the sudden closing of Babe's without notice or any opportunity to be heard on the matter.

This court found that the City of Jackson had failed to satisfy procedural safeguards by the manner in which it administered the licensing provisions of its Ordinance. The City's bureaucratic delay, due to either bad faith or simple negligence, persuaded the court to conclude that the City of Jackson had failed to comply with the provisions of its own Ordinance and, by failing to follow its own established procedure, the City had denied the plaintiff its procedural due process rights.

The City of Jackson ultimately agreed with the court's determination that a constitutional violation had occurred and no appeal of the court's decision was pursued. On the matter of damages, however, the parties have taken divergent paths and this court now must determine whether a proper measure of relief can be ascertained from the evidence presented. This court is allowed wide discretion in setting a damage award. *Wheat v. United States*, 860 F.2d 1256, 1259 (5th Cir.1988).

## THE MATTER OF DAMAGES IN CIVIL RIGHTS CASES

The instant case arises under Title 42 U.S.C. § 1983. Section 1983 provides redress for those who have been injured or deprived of their rights under color of state law (See footnote 2). *Leffall v. Dallas Independent School District*, 28 F.3d 521, 525 (5th Cir. 1994) (citing *West v. Atkins*, 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988)). The required proofs of "deprivation" and "under color of state law" have been made in the instant case. The matter of causation regarding damages is no longer in

question as the defendants have conceded the issue of liability.[3]  Thus, the efforts of this court now must be focused on determining the measure of damages.

In the case of *Memphis Community School Dist. v. Stachura*, 477 U.S. 299, 305-06, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986), the United States Supreme Court once again noted that cases arising under Title 42 U.S.C. § 1983 create, " 'a species of tort liability' in favor of persons who are deprived of 'rights, privileges, or immunities secured' to them by the [United States] Constitution." *Carey v. Piphus*, 435 U.S. 247, 253, 98 S.Ct. 1042, 1047, 55 L.Ed.2d 252 (1978);  *Imbler v. Pachtman*, 424 U.S. 409, 417, 96 S.Ct. 984, 988, 47 L.Ed.2d 128 (1976); *see also Smith v. Wade*, 461 U.S. 30, 34, 103 S.Ct. 1625, 1628, 75 L.Ed.2d 632 (1983); *Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 258-259, 101 S.Ct. 2748, 2755-2756, 69 L.Ed.2d 616 (1981).  Accordingly, when § 1983 plaintiffs seek damages for violations of constitutional rights, the level of damages is ordinarily determined according to principles derived from the common law of torts as a matter of federal common law.  *See Smith v. Wade*, 461 U.S., at 34, 103 S.Ct., at 1628; *Carey v. Piphus*, 435 U.S., at 257-258, 98 S.Ct., at 1048-1049. *See also Sockwell v. Phelps*, 20 F.3d 187, 192 (5th Cir. 1994).  Furthermore, in civil rights cases, Congress has directed the federal courts to use that combination of federal law, common law, and state law as will be best 'adapted to the object' of the

---

[3]In *Carey v. Piphus*, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978), the United States Supreme Court stated the well-established rule that in order to collect money damages, plaintiffs in § 1983 procedural due process actions must prove that they have been injured. *Id.,* 98 S.Ct. 1042, 1047-49.  This proof is established in the instant case.  *See* this court's prior Opinion granting injunctive relief.

civil rights laws.  Title 42 U.S.C. § 1988.[4]   Therefore a federal court is required to use common law powers to facilitate, and not to hinder, 'proceedings in vindication of civil rights.' *Lefton v. City of Hattiesburg, Miss.*, 333 F.2d 280, 284 (5th Cir. 1964).

Damages in cases governed by common law tort principles are designed to provide, "compensation for the injury caused to plaintiff by defendant's breach of duty." *See* 2 F. Harper, F. James, & O. Gray, *Law of Torts* § 25.1, p. 490 (2d ed. 1986) (emphasis in original), [first edition] quoted in *Carey v. Piphus*, 435 U.S., at 255, 98 S.Ct., at 1047. *See also Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388, 395, 397, 91 S.Ct. 1999, 2004, 2005, 29 L.Ed.2d 619 (1971).  To that end, compensatory damages may include not only out-of-pocket loss and other monetary harms (the only damages sought in the instant case), but also such common law tort injuries[5] as "impairment of reputation ..., personal humiliation, and mental anguish and suffering."  *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 350, 94 S.Ct. 2997, 3012, 41 L.Ed.2d 789 (1974).

---

[4]Title 42 U.S.C. § 1988 provides in relevant part that, "[t]he jurisdiction in civil and criminal matters conferred on the district courts by the provisions of titles 13, 24, and 70 of the Revised Statutes for the protection of all persons in the United States in their civil rights, *and for their vindication, shall be exercised and enforced in conformity with the laws of the United States, so far as such laws are suitable to carry the same into effect; but in all cases where they are not adapted to the object, or are deficient in the provisions necessary to furnish suitable remedies and punish offenses against law, the common law, as modified and changed by the constitution and statutes of the State wherein the court having jurisdiction of such civil or criminal cause is held, so far as the same is not inconsistent with the Constitution and laws of the United States, shall be extended to and govern the said courts in the trial and disposition of the cause, ... .*"

[5]Compensatory damages may also include both special damages such as medical expenses, loss of wages, and lost future earnings, as well as general damages for pain and suffering and emotional and mental distress.  *See Stachura*, 477 U.S. at 307, 106 S.Ct. at 2543.  In the instant case the plaintiffs seek lost profits and lost future earnings.

Deterrence also is an important purpose of this common law tort system, but it operates through the mechanism of compensatory damages grounded in the determination of a plaintiff's actual losses. The United States Congress adopted this common-law system of recovery when it established liability for "constitutional torts." So, "the basic purpose" of § 1983 damages is "to compensate persons for injuries that are caused by the deprivation of constitutional rights." *Carey v. Piphus*, 435 U.S., at 254, 98 S.Ct., at 1047. *See also id.*, at 257, 98 S.Ct., at 1049, noting that damages awards under § 1983 should be governed by the principle of compensation for actual loss. "Mere proof of the violation of a constitutional right will not support an award of compensatory damages." *Ryland v. Shapiro*, 708 F.2d 967, 976 (5th Cir. 1983). The *Stachura* decision notes that no compensatory damages may be awarded in a § 1983 suit based upon some abstract value of a constitutional right. *Id.*, 106 S.Ct. at 2543.

## APPLICABLE LAW

This court is guided by Title 42 U.S.C. § 1988 to determine the measure of damages in the instant case by reference to the common law, as modified and changed by the constitution and statutes of the State wherein this court has jurisdiction over the civil cause at hand. Thus, the applicable law in this case shall be drawn from this court's jurisdictional base, the State of Mississippi, in accordance with § 1988, and this law shall be applied so far as it is not inconsistent with the Constitution and laws of the United States. If any inconsistency is encountered, or if Mississippi law has not addressed the topic at hand, this court shall look to the decisions of the United States Court of Appeals for the Fifth Circuit, and then to any

9

combination of federal law, common law, and state law as will be best 'adapted to the object' of the civil rights laws and which will assist this court in arriving at a proper measure of damages, and to facilitate, rather than hinder, the vindication of civil rights.' *Lefton v. City of Hattiesburg, Miss.*, 333 F.2d at 284.

So, under Mississippi law, in order to establish the losses claimed in the instant case, the plaintiff is required to offer the best evidence available for each item of damage. If records are available, they must be produced.[6] And while certainty is not required, a party must produce the best that is available to him." *Eastland v. Gregory*, 530 So.2d 172, 174 (Miss. 1988) (citing *Thomas v. Global Boat Builders & Repairmen, Inc.*, 482 So.2d 1112 (Miss.1986); and *Copiah Dairies, Inc. v. Addkison*, 247 Miss. 327, 153 So.2d 689 (1963).

Recovery of lost profits does not require that the loss be susceptible to exact calculation. Nevertheless, the amount of the loss must be shown by competent evidence with *reasonable certainty*. While this reasonably-certain-evidence determination is a fact intensive inquiry, opinions of estimated lost profits must, at a minimum, be based on objective facts, figures, or data from which the amount of lost profits can be ascertained. *City of New Albany v. Barkley*, 510 So.2d 805, 807 (Miss. 1987) (citing *Harrison v. Prather*, 435 F.2d 1168, 1174 (5th Cir.1970))*; Purina Mills, Inc. v. Moak*, 575 So.2d 993 (Miss. 1990). *See also DIJO, Inc. v. Hilton Hotels Corp.*

---

[6]Evidentiary standards for the recovery of lost profits require objective proof from which a trier of fact can reasonably infer that the profits would have continued in the future in the same pattern had the injury not occurred. *See Standard Products, Inc. v. Patterson*, 317 So.2d 376, 378 (Miss. 1975)(proof of lost pecuniary benefits of deceased seaman); Parker, *Mississippi Law of Damages*, § 12-8, 2 ed. 2002.

351 F.3d 679, 687 (5th Cir. 2003) (same). Of course, it is the plaintiff who bears the

burden of proof as to the amount of damages. *City of New Albany*, 510 So.2d at 808

(citing *Harper v. Hudson*, 418 So.2d 54 (Miss.1982)); *see also Continental Oil Co. v.

S.S. Electra*, 431 F.2d 391 (5th Cir. 1970) (concerning lost profit damages to a vessel,

burden is upon the plaintiff to prove the extent of the damages actually sustained).

Furthermore, the Mississippi Supreme Court holds that when calculating the

loss of profits,  the loss to be calculated is that of *net profits*, not *gross profits*. *See

Puckett Machinery Co. v. Edwards,* 641 So.2d 29, 37-38 (Miss. 1994), citing *Lovett v.

E.L. Garner, Inc.*, 511 So.2d 1346, 1353 (Miss.1987).  *See also* Dunn, *Recovery of

Damages for Lost Profits 3d*, § 6.1 (1987), cited in *Lovett*; and *Cook Industries, Inc. v.

Carlson*, 334 F.Supp. 809, 816 (N.D. Miss.1971).

In *Lovett* the Mississippi Supreme Court observed the following:

> There are no guidelines set in stone specifying the degree of certainty that
> we require of parties in proving loss of future profits.  Indeed, the degree of
> proof required usually depends on the particular facts of the case.  See
> Note, *The Requirement of Certainty and the Proof of Lost Profits*, 64
> Harv.L.Rev. 317, 319 (1950). One guideline frequently recognized by this
> Court is a party's proof of its past profits. *See Sanders v. Dantzler*, 375
> So.2d 774, 777 (Miss. 1979); *Mississippi Power & Light Co. v. Pitts*, 181
> Miss. 344, 362, 179 So. 363, 366 (1938).

*Lovett*, 511 So.2d at 1353.

While the *Lovett* Court acknowledged the utilization of data pertaining to past profits in

order to determine present and future lost profits, it rejected the submission of such

evidence when it was misleading or resulted in inaccurate amounts for future profits.

Instructing the parties on how to better to ascertain lost *net* profits, the Court stated

that a party must deduct such items (of expense) as overhead, depreciation, taxes and inflation. *Id.*, 511 So.2d at 1353.

So, under Mississippi law, a plaintiff is entitled to the gross amount that would have been received pursuant to the business that was interrupted by a defendant's wrongful act, less the cost of running the business. *Fred's Stores of Mississippi, Inc. v. M & H Drugs, Inc.*, 725 So.2d 902, 914 (Miss. 1994) (quoting *Cook Indus., Inc. v. Carlson*, 334 F.Supp. 809, 817 (N.D. Miss. 1971)). Variable costs[7] related to lost business opportunities ( e.g., labor, utilities, etc.) must be deducted from a gross profit estimate. Fixed overhead costs that would have been incurred under any circumstance ( e.g., depreciation, rent, etc.) need not be.[8] Reduced to a simple equation, lost income equals the revenue that would have been generated less those variable costs that would have been incurred in the absence of the complained of breach. *See Work v. Commercial Underwriters Ins. Co.,* 61 Fed.Appx. 120 (5th Cir. 2003), citing *Lovett* and *Sure-Trip, Inc. v. Westinghouse Engineering*, 47 F.3d 526, 531 (3d Cir. 1995) ("Where plaintiff is seeking to recover lost profits, such damages are equal to the revenue that would have been derived, less additional costs that would have been incurred).

---

[7]Variable costs include labor, material or overhead that changes according to the change in the volume of production units. Combined with fixed costs, variable costs make up the total cost of production. While the total variable cost changes with increased production, the total fixed costs stays the same. *See* www.investorwords.com.

[8]Fixed costs, which do not vary depending on production or sales levels, are costs such as rent, property tax, insurance, or interest expense. *See* www.investorwords.com.

This court takes particular note of the Mississippi case of *Parker Tractor & Implement Co. v. Johnson*, 819 So.2d 1234 (Miss. 2002), where a farmer sued the company from which he bought a combine when the equipment operated at only half its promised speed. The farmer argued that the malfunctioning of the combine roughly cut his profits in half. The Fifth Circuit, citing this case favorably in *Work v. Commercial Underwriters Ins. Co.*, complimented the evidence presented in support of the farmer's lost profits claim, noting that he offered both his own testimony about the number of acres he was unable to cut because of the speed problem and his accountant's expert testimony about his cost per acre to use the combine. He also introduced "all existing records which could have shown pertinent losses ..., including a summary of loss calculations and [his] tax reports." The Fifth Circuit noted that the precision of the data the farmer offered allowed for the calculation of an estimate of his lost income at $91,610.75. He asked for $90,000. The jury awarded him $150,000, which the court reduced to $90,000. *See Parker Tractor*, 819 So.2d at 1239. The combination of the plaintiff's testimony concerning his record keeping, all the documentary evidence submitted, and the expert's testimony satisfied the Fifth Circuit that lost profit damages had been substantiated in the most adequate manner possible under the circumstances of that case.

## **THE EXPERTS**

The City of Jackson relies on the methodology offered by James L. Henley, Jr., a certified public accountant, forensic financial analyst and attorney, whose resume is exhibit D-1. The plaintiff relies on the methodology offered by Harold C. Wellman, an accountant who regularly reconciles the financial data submitted by Babe's for the

13

purpose of presenting profits/loss statements and preparing tax returns. His resume is exhibit P-9. The City of Jackson has challenged the methodology used by Wellman because, according to the City, his approach is not based on the best evidence, does not employ the most reliable accounting principles, and because Wellman, unlike Henley, is currently not a practicing Certified Public Accountant (CPA).

This court is not persuaded by the City's criticism of Wellman's ability to offer useful testimony in this case. Even if Wellman's opinion on lost profits is inadmissible as an expert opinion under Rule 702, he still may provide a lay opinion on lost profits and reasonable royalty rates. "[A] layman can under certain circumstances express an opinion even on matters appropriate for expert testimony." *Mississippi Chemical Corporation v. Dresser-Rand Co.*, 287 F.3d 359, 373 (5th Cir. 2002) (quoting *Soden v. Freightliner Corporation*, 714 F.2d 498, 511 (5th Cir.1983). Wellman's experience with, and personal knowledge of, Babe's books and accounting procedures qualifies him to give a lay opinion on any lost profits based on his personal knowledge and experience.

Moreover, the courts have allowed lost-profit or lost-sales testimony by a lay witness if the witness has direct knowledge of the business accounts underlying the profit calculation. *See Mississippi Chemical Corporation*, 287 F.3d at 373-74 (allowing Rule 701 testimony by a director of risk management and property taxation concerning the amount of lost profits caused by a defective compressor train). Several other Circuit Courts permit such testimony. *See Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1175 (3d Cir. 1993) (allowing Rule 701 testimony by the owner of a corporation as to the amount of lost profits); *In re Merritt Logan, Inc.*, 901 F.2d 349, 359 (3d Cir.

14

1990) (allowing Rule 701 testimony by the principal shareholder of the plaintiff concerning that company's lost profits);  *Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 265 (2d Cir. 1995) ("[A] president of a company, such as Cook, has 'personal knowledge of his business ... sufficient to make ... him eligible under Rule 701 to testify as to how lost profits could be calculated.' ").

Therefore, this court accepts the testimony of each expert witness as properly qualified and competent.  Now, the court must review the methodologies presented to determine if either of them, neither of them, or a combination of both best supports a measure of damages in this case.

## ANALYSIS

In *Montgomery Ward & Co. v. Hutchison*, 173 Miss. 701, 159 So. 862, 863 (1935), the Mississippi Supreme Court stated that, "[u]nder our jurisprudence, the rule as to uncertain or speculative damages does not apply to uncertainty as to the amount of the profits which would have been derived, but to uncertainties or speculation as to whether (1) the loss of profits was the result of the wrong, and (2) whether any such profits would have been derived at all. ...  It is enough that the evidence furnishes sufficient data for an approximate estimate of the amount of the damages."  *Id*.

One standard accepted by Mississippi courts to prove lost profits is a party's proof of past profits.  *Sanders v. Dantzler*, 375 So.2d 774, 777 (Miss. 1979) (finding error where the trial court excluded evidence of past profits).  *See also Mississippi Power & Light Co. v. Pitts,* 181 Miss. 344, 179 So. 363 (1938) (allowing proof of profits in previous years to be introduced into evidence as a basis for assessing damages for future loss).  In the instant case the plaintiff's methodology most closely resembles an

attempt to establish profits for the years 2003 through 2005 as the basis of the claim for lost profits over the twenty-four days Babe's was forced to be closed in 2006. Additionally, The plaintiff claims a damaging impact on profits for four months after Babe's reopened.

**Plaintiff's Evidence in Support of Damages**

*Exhibit P-2* - The plaintiff submits the financial statements for Babe's (J&B Entertainment, Inc.), comprised of a balance sheet and an income statement (see exhibit P-2). The plaintiff has submitted these documents for the years 2003 through 2006 to support the manner in which it has derived the measure of lost profits. Exhibit P-2 provides the same data for the years 2003, 2004, 2005 and 2006.

*Total revenue* for each year is shown on the income statement. For the year 2003 the *total revenue* is $779,755.75. From this amount is subtracted the *cost of sales* (beer purchases) in the amount of $88,302.30, yielding *gross profit* of $691,453.45. The income statement then lists *operating expenses*, including cash shortages, contract services, insurance, maintenance, leased employee expense (or salaries), rent, bar supplies, utilities, security, advertising, credit card fees, depreciation, professional fees, office supplies, taxes (property, sales and other), license fees, telephone expense, trash removal and laundry expense. Added together, these figures amount to $486,920.06. Once *operating expenses* are subtracted from the *gross profit* figure of $691,453.45, the *net income* figure is $204,533.39. Comparing this figure to the J&B Entertainment tax return for 2003 (form 1120S), J&B shows ordinary income from trade or business activities in the amount of $205,782.00. These figures align very closely.

16

The income statement for 2004 shows total revenue to be $746,203.50. After subtracting total operating costs and expenses, the total net income figure for 2004 is $49,959.59. Reference to the J&B Entertainment tax return for 2004 shows a total net income for that year of $49,819.00. Once again, the tax return figure aligns very closely to the total net income shown on the financial statement.

The income statement for the year 2005 reflects a downturn in business fortunes for Babe's. The total revenue is $663,545.45. When total operating expenses and costs are subtracted, the total net income for 2005 is a loss in the amount of ($141,652.49). The income tax return for 2005 shows a loss of ($140, 296.00).

*Exhibit P-3 through P-8 -* Exhibit P-3 is a cumulative general ledger showing all receipts and disbursements between 2003 and 2006 for cash and credit card transactions, as well as adjustments for leasehold expenses, depreciation, utility deposits, loans from shareholders, stock, door sales, service charges and beer sales. Exhibit P-4 consists of bank statements for 2003 through 2006, while Exhibits P-5 through P-8 are summary sheets showing the compilation of daily and monthly sales and expense activity for Babe's. These documents are offered as the basis for the plaintiff's calculations of revenue and expenses for each year from 2003 through 2006.

Exhibit P-10 is a daily/monthly sales report showing total revenue received each month between March and August of the years 2003 through 2006. This is the plaintiff's primary exhibit in support of the claim for damages incurred as a result of the 24-day forced closing. Taking a comparable 24-day period from March to April for the

years 2003 through 2005, and extrapolating an average daily performance for Babe's, the plaintiff has calculated an average total revenue figure for each day. The average total income for each day of each comparable 24-day period has been determined by the plaintiff to be $2,460.48 for 2003; $2,328.28 for 2004; and $2,342.11 for 2005. Based on these figures, the plaintiff derives an average daily total revenue figure representing an amount the plaintiff says it was prevented from realizing while closed. This figure is an average $2,377.02 per day for the 24 days Babe's was forced to be closed in 2006. Then, the plaintiff has calculated a total amount of lost revenue opportunity for the 24 day period ($2,377.02 x 24) which is $57,048.58. This figure is comprised of total revenue figures unadjusted for the cost of acquiring this revenue.

Next, Exhibit P-10 shows monthly sales figures for the months of March through August of the years 2003, 2004, 2005 and 2006. These figures are *total revenue* figures for these particular months. No operating costs or expenses are shown. For instance, for the year 2003, the exhibit displays the following figures:

|  | March | April | May | June | July | August |
|---|---|---|---|---|---|---|
| **2003** | $63,865.50 | $64,680.25 | $69,279.25 | $63,592.00 | $68,924.75 | $67,065.00 |

The aggregate total revenue for all these months also is show to be $397,406.75.

For 2004 and 2005 the figures are as follows:

|  | March | April | May | June | July | August |
|---|---|---|---|---|---|---|
| **2004** | $64,321.00 | $64,501.00 | $61,389.50 | $62,374.25 | $65,238.50 | $59,520.25 |
| **2005** | *$64,709.25*[9] | $58,204.00 | $55,031.50 | $56,107.25 | $52,491.25 | $46,368.50 |

---

[9]This figure for March 2005 in Exhibit P-10 does not match the total revenue figure in Exhibit P-2 for this same month of $61,377.35

The aggregate total revenue for each of the years 2004 and 2005 is shown by the plaintiff to be $377,344.50 and 332,911.75, respectively. The figures for the three years from 2003 through 2005 show an overall down trend in total revenue. However, the figures for March of each year do not vary significantly, averaging $64,298.58 total revenue each year.

Exhibit P-2 shows the total cost of sales and total operating expenses for the month of March for each of the three years comprising the plaintiff's analysis:

**March Costs and Expenses**

**2003** - $60,912.63

**2004** - $42,998.92

**2005** - $32,645.19

These figures include both fixed and variable costs for the month of March in each year. Subtracting these numbers from the total revenue figures for each of these monthly time periods, the *net income* figures for the month of March for each year is $2,952.87 for 2003; and $21,322.08 for 2004, figures which appear in Exhibit P-2. While Exhibit P-10 shows gross revenue for March of 2005 to be $64,709.25, Exhibit P-2, however, shows the gross revenue for this same month to be $61,337.35 (see footnote 9). Construing the discrepancy against the party who compiled the figures, this court accepts $61,337.35 as the gross revenue figure for March of 2005. Subtracting the March 2005 total cost and expense figure of $32, 645.19, the net income (net profit) figure for March of 2005 is $28,692.16. So, these figures are set forth as follows:

19

**March Net Profits**

**2003** - $2,952.87

**2004** - $21,322.08

**2005** - $28,692.16

These figures match the net profit figures shown by Exhibit P-2 for these months.

### *Damages Determination for the 24-day Period*

For 2006, Babe's was forced to close in the month of March for 24 days and allowed to reopen by this court decision on Babe's request for injunctive relief. The plaintiff attempts to show the damages it suffered over this 24-day period in 2006 by submitting the total revenue figures for the comparable days of March in 2003, 2004 and 2005 as follows:

**March Total Revenue for 24-Day Period**

**2003** - $59,051.50

**2004** - $55,883.50

**2005** - $56,210.75

The total costs and expenses for these respective 24-day periods are not shown.

Next, the plaintiff converts these figures into average daily figures of $2,460.48 for 2003; $2,328.28 for 2004; and $2,342.11 for 2005, as previously noted. The plaintiff then averages these three figures to show an average of $2,377.02 per day for the 24 days it was forced to be closed in 2006. Multiplying this figure by 24, the

plaintiff derives an average "composite of monies lost" figure (already set forth above) of $57,048.58.

*Exhibit P-13* Turning to Exhibit P-13, page 2 of 4, the plaintiff has derived a composite variable cost figure of $23,490.98 for the 24-day closure period, taking the variable costs from Exhibit P-2, a figure which does not include costs such as rent, utilities, insurance and other *fixed* monthly costs, and subtracting this number from the "composite monies lost" figure above ($57,048.58 - $23,490.98). Resultantly, the total loss for the 24-day closure period, according to the plaintiff, is $33,557.61. This court has reviewed this calculation and the exhibits supporting it closely, finding that the plaintiff adequately has shown net lost profits for the 24-day period that Babe's was closed.

**The Four Month Period After Babe's Reopened**

The plaintiff has submitted a statement of *consequential damages* as part of Exhibit P-13 which shows the purported "negative impact" the 24-day closure period had on a portion of March and April of 2006, and the four months following Babe's reopening. The plaintiff submits the monthly sales (total revenue) figures for the months of March through August for the years 2003 through 2006.

|  | March | April | May | June | July | August |
|---|---|---|---|---|---|---|
| **2003** | $63,865.50 | $64,680.25 | $69,279.25 | $63,592.00 | $68,924.75 | $67,065.00 |

For 2004 and 2005 the figures are as follows:

| | March | April | May | June | July | August |
|---|---|---|---|---|---|---|
| **2004** | $64,321.00 | $64,501.00 | $61,389.50 | $62,374.25 | $65,238.50 | $59,520.25 |
| **2005** | *$61,377.35*[10] | $58,204.00 | $55,031.50 | $56,107.25 | $52,491.25 | $46,368.50 |
| **2006** | $12,054.75 | $30,523.25 | $43,815.00 | $46,951.00 | $47,531.00 | $46,368.50 |

The aggregate total revenue for all the months in 2003 is shown by the plaintiff to be $397,406.75.  For 2004 the aggregate figure for these months is $377,344.50; $332,911.75 for 2005; and 234,920.65 for 2006.

The plaintiff next has determined the average gross revenue for each individual month of the time periods in question from 2003 through 2005.  As noted above, the average total revenue figure for March of 2003, 2004 and 2005 is $64,298.58.  For April in each of these years the figure is $62,461.75; for May the figure is $61,900.08; for June, $60,691.17; July, 62,218.17; and August, $57,651.25.  The following is a chart of these figures:

| | March | April | May | June | July | August |
|---|---|---|---|---|---|---|
| **2003-2005** | $64,298.58 | $62,461.75 | $61,900.08 | $60,691.17 | $62,218.17 | $57,651.25 |

The plaintiff then subtracts the 2006 revenue figures below from these average figures:

| | March | April | May | June | July | August |
|---|---|---|---|---|---|---|
| **2006** | $12,054.75 | $30,523.25 | $43,815.00 | $46,951.00 | $47,531.00 | $46,368.50 |

---

[10]See footnote 9.

| | March | April | May | June | July | August |
|---|---|---|---|---|---|---|
| LOSS[11] | *$21,908.70* | *$24,726.58* | $18,085.08 | $13,740.17 | $14,687.17 | $3,605.60 |

The next step in the plaintiff's process is to add together March through July, while declaring that August was substantially back to normal. Thus, the total "negative impact" on the four months following Babe's return to business is stated by the plaintiff to be $93,147.70. This is the amount of damages the plaintiff claims. This court does not agree.

The plaintiff's damage calculation for the four months following the 24-day closure period is based on the principle of "negative impact." Nowhere has the plaintiff submitted Mississippi authority which accepts this methodology for determining lost profits. "Profits are the net pecuniary gain from a transaction, the gross pecuniary gains diminished by the cost of obtaining them." *Stewart & Stevenson Services, Inc. v. Pickard*, 749 F.2d 635, 646 (11th Cir. 1984). This Eleventh Circuit decision is cited by many federal courts within the Fifth Circuit as having set forth the proper definition of "profit(s)." *See Fred's Stores of Mississippi, Inc. v. M & H Drugs, Inc.*, 725 So.2d 902, 914 (Miss. 1994) (quoting *Cook Indus., Inc. v. Carlson*, 334 F.Supp. 809, 817 (N.D.

---

[11]The average revenue figures for March and April are adjusted further to reflect all the days that Babe's was closed in March and April of 2006, including 24 days of forced closure, plus the 13 additional days in April that Babe's was closed while setting up for reopening. The average revenue of *$52,243.83* has been multiplied by 13/31 (appx. 41%) while the *$31,938.50* revenue figure has been multiplied by 24/31 (appx. 77%). Of course, April only has 30 days, but no adjustment or correction has been made by the plaintiff for this slight error.

Miss. 1971)) ( plaintiff is entitled to the gross amount that would have been received pursuant to the business that was interrupted by a defendant's wrongful act, less the cost of running the business).   Net profit, the measure of damages for lost profits under Mississippi law,[12] is defined as the 'gross amount that would have been received pursuant to the business or investment' less 'the costs of running that business or attending that investment.'" *Stewart & Stevenson Services,* 749 F.2d at 646.  What the plaintiff has presented in the instant case is merely Babe's expectation of gross profits adjusted for the "negative impact" upon that expectation caused by the defendant's conduct.  The measure of the defendant's "negative impact" upon the plaintiff's expectation of profit is just too speculative to persuade this court that a proper measure of damages for the four months following Babe's forced closure has been expressed.

### *The Actual Profit Figures - Court's Calculation of Damages for the 4 Month Period*

This court has undertaken to obtain a measure of damages based not on the "negative impact" methodology employed by the plaintiff, but by relying on the actual net profit figures already calculated by the plaintiff in its income statements (Exhibit P-2).

Exhibit P-2 presents actual profit figures for the months of March through July, from 2003 through 2005.  These months correspond to the four-month period following Babe's reopening in 2006.  Inasmuch as Babe's was no longer under enforced closure

---

[12]*See Puckett Machinery Co. v. Edwards,* 641 So.2d 29, 37-38 (Miss. 1994), citing *Lovett v. E.L. Garner, Inc.*, 511 So.2d 1346, 1353 (Miss. 1987).

at this time, this court finds that total costs are appropriate to determine lost profits rather than just the lesser variable cost amount subtracted from the average total revenue figure. The net profit (also referred to as net income) figures extracted from Exhibit P-2 are as follows:

|  | March | April | May | June | July |
|---|---|---|---|---|---|
| **2003** | $2,952.87 | $30,437.28 | $11,466.15 | $10,031.99 | $11,505.22 |
| **2004** | $21,322.08 | $26,48.41 | $23,117.58 | $26,138.17 | $29,123.07 |
| **2005** | $28,692.16 | $29,243.46 | $33,052.37 | $8,618.82 | $19,222.72 |

In order to obtain a reasonable expectation of profits for each of these months in the year 2006, this court, following the averaging process already employed by the plaintiff, has obtained average net figures for these months as follows:

|  | March | April | May | June | July |
|---|---|---|---|---|---|
| **2003-2005** | $17,655.70 | $28,720.32 | $22,545.37 | $14,929.66 | $19,950.34 |

These are the figures representing the reasonable net profits Babe's arguably could have expected for these months in 2006. Applying the adjustments proposed by the plaintiff for the averaged months of March and April the final chart is as follows:

|  | March | April | May | June | July |
|---|---|---|---|---|---|
| **2003-2005** | $7,390.16 | $22,235.09 | $22,545.37 | $14,929.66 | $19,950.34 |

Now, for the period in question in 2006, Babe's actually earned the following:

|  | March | April | May | June | July |
|---|---|---|---|---|---|
| **2006** | ($8,134.48) | $929.82 | $18,408.17 | $13,651.01 | $11,179.35 |

These figures represent the actual net profits earned by Babes in 2006. The amount of damages is the difference between what Babe's should have made based on the prior three-year average for the months in question, and the actual figures for those months in 2006. Thus, the amount of loss figures are:

|  | March | April | May | June | July |
|---|---|---|---|---|---|
| **2006** | $15,524.64 | $21,305.27 | $4,137.20 | $1,278.65 | $8,770.99 |

Adding these loss figures together, the total loss for the four months after Babe's went back into operation is $51,016.75. This is the amount this court finds to be a reasonable measure of lost profits for the four months following the 24-day period that Babe's was closed.

## CONCLUSION

Based on the foregoing analysis, this court finds the total damages figure to be $33,557.61 for the 24-day period of closure, plus $51,016.75 for the four months Babe's spent reestablishing itself, which equals $84,574.36.

In arriving at this determination, this court has relied in great part on the J&B Entertainment profit/loss statement (Exhibit P-2) which shows total revenues, costs and net profits for the three years prior to Babe's enforced closure, as well as the year Babe's was closed and then reopened. This court also has relied on information included in plaintiff's tax return.

This court, however, has taken care not to equate taxable income with net profit, particularly taking into account the difficulties one may encounter when one attempts to recast tax returns into profit and loss statements. *See Sure-Trip, Inc. v. Westinghouse Engineering*, 47 F.3d 526, 536 (2nd Cir. 1995) (also noting that business expenses such

as rent and depreciation are not typically deducted in arriving at damages for lost profits). This approach of equating taxable income with net profit was championed by James Henley, the City's expert. Mr. Henley relied solely on Babe's income tax returns for 2003 through 2006 to offer his damages estimate. So, inasmuch as the City of Jackson relies solely on income tax returns to arrive at its $8,000.00 figure, as suggested by Mr. Henley, the court rejects that analysis.

This court also has made no calculation for present value of the damages award. When calculating damages based on future profits, the Fifth Circuit has said that, "[t]he appropriate discount rate must be determined on the basis of the rate of interest which is reasonable in light of the risks involved." *In re Lambert*, 194 F.3d 679, 681 (5th Cir.1999); *see also In re Magna Cum Latte Inc*. Not Reported in B.R., 2008 WL 2047937 *17 (Bkrtcy. S.D. Tex.,2008), stating that, "[t]he lost profits amount must be further reduced to present value by the appropriate discount rate for lost profits arising from an involuntarily-terminated business." This court has refrained from making its own determination of what the proper discount rate should be in this case, particularly where the parties have presented no evidence as to what discount rate should be applied. Moreover, this court has been presented with actual net profit figures not only for the three years prior to 2006, but also the actual net profit figures for 2006 and the downtrend those figures reflect for the four month period after Babe's was closed. This court is satisfied that the evidence presented has furnished the court the data required for a just and reasonable determination of damages.

Thus, a separate judgment shall be entered for the plaintiff J&B Entertainment, doing business as Babe's Show Club, in the amount of $84,574.36.

**SO ORDERED** this the 31st day of March, 2010.

s/ **HENRY T. WINGATE**

_____
**CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**

Civil Action No. 3:06-cv-144WS
Order on Damages